STATE of Missouri, Respondent,

v.

Ralph Cecil FELTROP, Appellant.

Ralph Cecil FELTROP, Appellant,

v.

STATE of Missouri, Respondent.

No. 70896.

Supreme Court of Missouri,
En Banc.

Jan. 9, 1991.

As Modified on Denial of Rehearing
Feb. 7, 1991.

4

Janet M. Thompson, Columbia, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

COVINGTON, Judge.

Appellant Ralph Cecil Feltrop appeals his conviction by jury of murder in the first degree, § 565.020, RSMo 1986, for which Feltrop was sentenced to death, and he appeals from the denial of his postconviction relief motion. Affirmed.

Viewed in the light most favorable to the verdict, *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984), the facts are as follows: On or about March 9, 1987, Barbara Roam, appellant's live-in girlfriend, died from an incised wound to the right side of her neck which severed her vertebral artery, causing her to bleed to death. Appellant inflicted the wound by one forceful thrust from a sharp instrument that not only severed the vertebral artery but also penetrated the cervical spine, causing paralysis of Roam's right side. Appellant subsequently cut and hacked at Roam's body until he succeeded in severing her head, hands, and lower legs from her torso. He also severed one foot from the leg and aborted an attempt to sever her upper legs in the groin area. Appellant then stuffed the torso into a

trunk and dumped the trunk near Duke Road in St. Charles County. He placed the remainder of the body parts into garbage bags and threw them into a pond near Highway MM between Highway 21 and Highway 30 in Jefferson County. The body was preserved by refrigeration for at least one week. Whether the mutilation of Barbara Roam's body occurred prior to or after refrigeration was not established. Appellant's defense at trial was self-defense.

In the penalty phase, the state offered the evidence from the guilt phase. Appellant presented testimony of six witnesses who testified regarding appellant's background and character. The jury recommended the death penalty, finding as a statutory aggravating circumstance that the murder of Barbara Roam was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind. § 565.032.2(7), RSMo 1986. The trial court sentenced Feltrop to death.

Other facts relevant to the direct appeal are developed as required throughout the opinion.

## DIRECT APPEAL

### Preserved Error

Appellant contends that the trial court erred in denying his motions for change of venue and to strike for cause the entire venire. Appellant alleged that extensive pretrial publicity and the "spectacular nature of the offense charged" created a substantial likelihood that he would be denied a trial by a fair and impartial jury.

■ Whether to grant or deny a change of venue rests within the trial court's discretion, and its ruling will not be disturbed absent abuse of discretion. *State v. Schneider*, 736 S.W.2d 392, 402 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). Likewise, the trial court's ruling on challenges for cause will be rejected only if there is a clear showing of abuse of discretion and a real probability of injury to the complaining party. *State v. Wheat*, 775 S.W.2d 155, 158 (Mo. banc 1989), *cert. denied*, —— U.S.

——, 110 S.Ct. 744, 107 L.Ed.2d 762 (1990). An abuse of discretion exists only when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there. *State v. Leisure*, 749 S.W.2d 366, 376 (Mo. banc 1988). The relevant question is not whether or to what extent the community remembers the case, "but whether the jurors of … [Feltrop's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2890, 81 L.Ed.2d 847 (1984). The trial court is in a better position than the appellate court to assess the effect of publicity on the minds of the community and to determine whether the residents of the county are so prejudiced against a defendant that a fair trial would not be possible. *State v. Molasky*, 655 S.W.2d 663, 666 (Mo. App.1983), *cert. denied*, 464 U.S. 1049, 104 S.Ct. 727, 79 L.Ed.2d 187 (1984).

In *Patton*, all but two of the one hundred sixty-three venirepersons questioned about the case had heard of it, and one hundred twenty-six admitted that they would carry an opinion into the jury box. 467 U.S. at 1029, 104 S.Ct. at 2888. "[W]hile it is true that a number of jurors and veniremen testified that at one time they held opinions, for many, time had weakened or eliminated any conviction they had had." *Id.* at 1033, 104 S.Ct. at 2889. Those veniremen who retained their fixed opinions were removed from the venire. *Id.* at 1034, 104 S.Ct. at 2890. The United States Supreme Court found that the pretrial publicity did not make a fair trial impossible in the county in which the crime occurred. *Id.* at 1040, 104 S.Ct. at 2893.

■ In support of his motions, appellant submitted numerous newspaper articles, transcripts from television and radio stations, video tapes of newscasts, and an article from Detective Cases magazine. The bulk of the media coverage occurred more than a year prior to trial; the most recent exhibit was published eight months prior to trial. Of the one hundred two venirepersons questioned, sixty-eight indicated that they had some knowledge of the

case; of these the trial court struck eight. Of the fourteen venirepersons finally impaneled, eight had been exposed to some degree of pretrial publicity. All eight were asked specifically whether they could judge the case in a fair and impartial manner, and all eight indicated that they could.

The evidence presented at the hearing on appellant's motion for a change of venue did not show that the inhabitants of Jefferson County were so prejudiced against appellant that a fair trial could not occur. The trial court did not abuse its discretion by denying appellant's motion for a change of venue and his motion to strike the entire venire.

Appellant contends that the court erred in overruling his challenges for cause to venirepersons Courtois, Nalls and Harpole, thereby denying him the right to a full panel of qualified jurors before he was required to exercise his peremptory challenges.

The trial court possesses broad discretion in determining the qualifications of prospective jurors, and its ruling on a challenge for cause will not be disturbed on appeal unless it constitutes a clear abuse of discretion and a real probability of injury to the complaining party. *State v. Wheat*, 775 S.W.2d 155, 158 (Mo. banc 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 744, 107 L.Ed.2d 762 (1990).

An accused is entitled to a full panel of qualified jurors before he is required to expend peremptory challenges, and failure of the trial court to grant a legitimate challenge for cause is reversible error. *Id.* The critical question is whether the challenged venirepersons unequivocally indicated their ability to evaluate the evidence fairly and impartially. *State v. Lingar*, 726 S.W.2d 728, 734 (Mo. banc 1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1988). The trial court did not conduct an independent examination of these venirepersons, thus a more searching review by appellate courts is justified. *Id.*

Venireperson Courtois initially indicated that she might have difficulty affording defendant the presumption of innocence. Upon questioning, however, she stated unequivocally that she could follow the court's instructions and could act with fairness and impartiality.

Venireperson Nalls learned of the case from a woman who worked at Lucille's Restaurant, where Barbara Roam worked prior to her death. Ms. Nalls initially expressed uncertainty as to whether she could put that information aside. Upon questioning, however, Ms. Nalls stated that she had no reason to value the opinion of the woman from Lucille's Restaurant, and further stated unequivocally that she could set aside anything she might have heard or seen and base her decision solely upon what she heard at trial.

Venireperson Harpole read newspaper articles about the case and indicated that he felt there was a reason the defendant was arrested. His ability to follow the law and instructions of the court and to be fair is reflected as follows:

Q. At that time did you form any opinions or conclusions as to the guilt or innocence of any persons in connection with that?

A. No, I did not.

Q. Do you feel that you can put aside what you saw or heard in the news and base your decision, if chosen as a juror, solely on the evidence to be presented here in the courtroom and on the instructions to be given by Judge Hess?

A. Yes, I do.

Q. Do you feel that you can be fair and impartial to both the defendant and the state?

A. Yes.

Q. Can you promise this court that you can put aside any preconception that you might have and, if chosen as a juror, make your decision based solely on the evidence presented in this court and the instructions given by the Judge?

A. Yes, I could.

Q. Do you think that you can be fair and impartial to the defendant as well as to the state?

A. Yes, I believe I could.

■ Venirepersons are not automatically excluded for cause because they may have formed an opinion based on publicity. *State v. Walls*, 744 S.W.2d 791, 795 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). Initial reservations expressed by venirepersons do not determine their qualifications; consideration of the entire *voir dire* examination of the venireperson is determinative. *State v. Johnson*, 722 S.W.2d 62, 65 (Mo. banc 1986). The question is not whether a prospective juror holds opinions about the case, but whether these opinions will yield and the juror will determine the issues under the law. *State v. Griffin*, 756 S.W.2d 475, 481 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989).

Venirepersons Courtois, Nalls and Harpole demonstrated an ability to be fair and to follow the law and instructions of the court. The trial court did not abuse its discretion in overruling appellant's challenges for cause.

Appellant next asserts that the trial court erred in failing to read MAI–CR 3d 300.04 prior to the first recess. MAI–CR 3d 300.04 requires the court to instruct the jury prior to the first recess or adjournment not to discuss the case or to expose themselves to publicity about the case, and to remind the jury of these instructions prior to every subsequent recess or adjournment.

■ Failure to give a proper instruction is error, the prejudicial effect of which, if any, is to be judicially determined. *Rule* 28.02(f). To determine prejudice, the court considers the facts and instructions together. *State v. Ward*, 745 S.W.2d 666, 670 (Mo. banc 1988).

■ *Voir dire* examination prior to the first recess lasted approximately thirty minutes. The prosecutor questioned the venirepersons regarding whether any had heard of the case and whether any would suffer a hardship as a result of serving on a sequestered panel. Immediately after the panel returned from lunch, appellant informed the court of the omission and requested a mistrial. The court responded that counsel would be given opportunity to question the venirepersons regarding what discussions or exposures to publicity they might have experienced during the lunch hour. Counsel conducted *voir dire* in the normal course. A juror-by-juror examination during the entirety of *voir dire* revealed which jurors who had been exposed to publicity could be fair and impartial. Conduct of *voir dire* also revealed that one venireperson, Mary Green, had been exposed to a newspaper article about the case during the luncheon recess. She glanced at it as she used a telephone. According to Ms. Green, nothing about the article caused her to be unfair. The court read MAI–CR 3d 300.04 to the venire before it took its second recess and before each subsequent recess and adjournment. In view of the limited amount of *voir dire* conducted prior to the first recess, the opportunity given to appellant to question the venire as to what publicity they had been exposed during the first recess, and the fact that the instruction was read before each subsequent recess and adjournment, appellant suffered no prejudice. Moreover, to the extent appellant failed to question venirepersons about this particular subject, having been given opportunity to do so, he waived any claim of error.

■ Appellant next contends that the trial court erred in submitting Instruction 6B, patterned after MAI–CR 3d 313.44. MAI–CR 3d 313.44 requires jurors to fix punishment at life imprisonment if they "unanimously find that one or more mitigating circumstances exist sufficient to outweigh the aggravating circumstances found by you to exist." Appellant claims this language could have prevented jurors from considering all mitigating evidence. This Court has repeatedly upheld the constitutional validity of this instruction. *See State v. Reese*, 795 S.W.2d 69 (Mo. banc 1990); *State v. Petary*, 790 S.W.2d 243 (Mo. banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990); *Schneider v. State*, 787 S.W.2d 718 (Mo. banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 231, 112 L.Ed.2d 186 (1990); *Clemmons v. State*, 785 S.W.2d 524 (Mo. banc), *cert. denied*,

— U.S. ——, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990).

Appellant contends that the court erred in overruling his mistrial motion following this statement made by the prosecutor during *voir dire:* "I'll object. That's going into what's going to happen in the future. It's a discretionary decision for people in the future." Appellant contends that this statement violated the rule of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), that the state must not seek to minimize the jury's sense of responsibility for determining the appropriateness of the death penalty.

The declaration of a mistrial is a drastic remedy to be exercised only in extraordinary circumstances. *State v. Young*, 701 S.W.2d 429, 434 (Mo. banc 1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986). The trial court has the opportunity to observe the incident giving rise to the request for a mistrial and is in a better position than an appellate court to evaluate its prejudicial effect, thus this Court's review extends only to determining whether as a matter of law the trial court abused its discretion in refusing to declare a mistrial. *Id.*

The prosecutor's objection came during death qualification of the venire panel. Defense counsel asked: "Let me ask generally, does anyone here have the feeling that when we talk about life without probation or parole that it doesn't really mean life without probation or parole?" The prosecutor then made the speaking objection appellant claims was intended to minimize in the minds of the jurors their role in the sentencing process. Appellant contends this was clearly evidenced by a note sent to the court during penalty phase deliberations which read: "Is there any legal situation under which a person can be released who has received life without parole; that is pardoned by the governor. Please distinguish between life in prison and natural life. Are these one in [sic] the same? What is the length of life, capital life?"

There is no *Caldwell* violation. "To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989). *Caldwell* prohibits misleading the jury as to their role in the sentencing process; it does not prohibit correct statements of law. *Id.* See also *State v. Driscoll*, 711 S.W.2d 512, 515 (Mo. banc), *cert. denied*, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986); *State v. Roberts*, 709 S.W.2d 857, 869 (Mo. banc), *cert. denied*, 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986). There is no reasonable probability here that the statement under scrutiny misled the jury, or improperly described the role assigned to the jury by law. Furthermore, the comment was made during *voir dire*, and was not approved by the court, an important factual difference. *See Darden v. Wainwright*, 477 U.S. 168, 183, n. 15, 106 S.Ct. 2464, 2472, n. 15, 91 L.Ed.2d 144 (1986). Finally, appellant's inference that the statement alluded to possible future executive clemency is meritless. The question was addressed in *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), where the Court held that an instruction permitting a capital sentencing jury to consider the Governor's power to commute a life sentence did not unconstitutionally minimize the jurors' role in the sentencing process. The trial court did not abuse its discretion in refusing to grant a mistrial.

Appellant asserts that the court erred in finding the victim's six year old daughter, Stacy Roam, incompetent to testify and in excluding her prior statements as substantive evidence. Appellant contends that, had Stacy been allowed to testify, she would have corroborated his claim of self-defense.

Section 491.060, RSMo 1986, creates a rebuttable presumption that a child under ten years of age is incompetent to testify except as a victim of certain offenses. *State v. Williams*, 729 S.W.2d 197, 199 (Mo. banc), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). For a child under the age of ten to be adjudged competent to testify, the child

must exhibit: (1) a present understanding of, or the ability to understand upon instruction, the obligation to speak the truth; (2) the capacity to observe the occurrence about which testimony is being sought; (3) the capacity to remember the occurrence about which testimony is sought; and (4) the capacity to translate the occurrence into words. *State v. Ray,* 779 S.W.2d 3, 5 (Mo.App.1989). Determination of competency is left to the discretion of the trial court, and its decision will not be reversed absent a clear abuse of discretion. *State v. Johnson,* 694 S.W.2d 490, 491 (Mo.App. 1985).

■■■■■ Appellant contends that Stacy remembered the morning of March 9, 1987, and that she could testify that her mother was gone on that morning, thus bolstering appellant's claim that he killed Barbara the night before in self-defense. Appellant points to Stacy's answer to the question of what Feltrop had told her that morning: "He said right when I woke up in the morning my mom was gone."

Appellant ignores Stacy's prior answers in response to a question of whether appellant had taken her to day care that morning: "A: No, I don't remember that, no. My mom always took me to day care. Q: Right. Do you remember the day when Ralph took you to the day care? A: He didn't take me to day care. I told you, he didn't." Moreover, Stacy was unable to recall where she went to school, or when she started living with Rhonda Mayfield, Stacy's cousin. She exhibited no understanding of the obligation to tell the truth. She was uncooperative and unresponsive during the hearing. The testimony by Stacy's aunt, Rhonda Mayfield, that Stacy could carry on a conversation is not relevant to Stacy's competency either at the time of the occurrence or at trial.

The trial court had the opportunity to observe Stacy throughout the questioning. The court listened to the child's language, and observed her body language, facial expressions, and activities. There is no abuse of discretion in finding Stacy Roam incompetent to testify. Because the court also found that Stacy was incompetent to testi-fy at the time of the crime, appellant's additional contention that he could have used Stacy's prior statements as substantive evidence must fail.

Appellant maintains that the trial court erred in admitting photographs of the victim into evidence during both the guilt and punishment stages of trial. The photographs depict the condition and location of the body as well as the condition and location of the wounds. Appellant contends that the photographs were cumulative, gruesome, unduly inflammatory and irrelevant and that their prejudicial impact outweighed their probative value. Appellant contends the photographs had limited, if any, probative value because the victim's identity was not in dispute nor was the manner of killing or the condition of the corpse, and because defendant relied on self-defense at trial.

■■■■ The trial court is vested with broad discretion in the admission of photographs. *State v. McMillin,* 783 S.W.2d 82, 101 (Mo. banc), *cert. denied,* — U.S. —, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). "Photographs, although gruesome, may be admitted where they show the nature and location of wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case." *State v. Murray,* 744 S.W.2d 762, 772 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). Photographs are also relevant when they depict the condition and location of the body. *State v. Evans,* 639 S.W.2d 820, 822 (Mo.1982). "[A] photograph is not rendered inadmissible because other evidence may have described what is shown in the photograph; nor is the state precluded from introducing the photograph because the defendant expresses a willingness to stipulate to some of the issues involved." *State v. Schneider,* 736 S.W.2d 392, 403 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988).

■■■ Appellant's contentions are mistaken. The photographs show the torso of the victim in the trunk, the body parts as found in the garbage bag, and close-ups of the various wounds. They are clearly relevant

to show the nature and condition of the body, the nature and condition of the wounds, to aid the jury in understanding the testimony of the medical examiner, to corroborate testimony of various state's witnesses, and to aid the state in establishing an element of its case. Appellant's contention that the photographs are cumulative is also incorrect; the photographs depict different wounds and views of the body.

"If a photograph is relevant, it should not be excluded because it may be inflammatory, unless the situation is so unusual that the extent of the prejudice overrides the photograph's probative value." *Murray*, 744 S.W.2d at 772. Although the facts here are somewhat more unusual than in *Murray*, where the defendant was convicted of two counts of first degree murder for the execution-style killing of two robbery victims, the prejudicial impact of these photographs nevertheless does not outweigh their probative value. "Insofar as the photographs tend to be shocking or gruesome it is because the crime is of that sort." *State v. Clemons*, 643 S.W.2d 803, 805 (Mo. banc 1983).

This Court has not, as appellant suggests, abandoned its duty to weigh the prejudicial effect of photographs against their probative value. Defendants may not so easily escape the brutality of their own actions; gruesome crimes produce gruesome, yet probative, photographs. The court did not abuse its discretion in admitting the photographs in question.

Appellant next claims that he is entitled to a new trial on the basis of instructional error. The trial court initially submitted a verdict director that did not contain a cross-reference to the self-defense instruction. Appellant correctly notes that the failure to cross-reference is error that is not cured by giving a separate self-defense instruction.

The facts of the present case do not merit reversal. The prejudicial effect of an erroneous instruction given in violation of the notes on use is to be judicially determined. *Rule 28.02(f)*. "Prejudice occurs when an erroneous instruction may adversely influence the jury." *State v. Lingar*, 726 S.W.2d 728, 738 (Mo. banc 1987). Here, the trial court withdrew the initial verdict director only minutes after the jury retired to deliberate and replaced the erroneous verdict director with the correct instruction. If the instruction had at that time been read by the jury, the corrected verdict director would serve to draw attention to the cross-reference to the self-defense instruction. As a consequence, the jury could not have been adversely influenced by the first verdict director, and appellant has suffered no prejudice.

Appellant next contends that the trial court erred in overruling his motion for a judgment of acquittal at the close of all of the evidence because there was no evidence of deliberation.

"In assessing a challenge to the sufficiency of the evidence, the evidence, together with all reasonable inferences to be drawn therefrom, is viewed in the light most favorable to the verdict and evidence and inferences contrary to the verdict are ignored." *State v. Clemmons*, 753 S.W.2d 901, 904 (Mo. banc), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). This Court's function is not to weigh the evidence but to determine whether there was sufficient evidence from which reasonable persons could have found appellant guilty as charged. *State v. Steward*, 734 S.W.2d 821, 822 (Mo. banc 1987).

Deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.002(3), RSMo 1986. "It is not necessary that the actor brood over his actions for an appreciable period of time." *State v. Ingram*, 607 S.W.2d 438, 443 (Mo.1980). Deliberation may be inferred from the circumstances surrounding the murder. *State v. Antwine*, 743 S.W.2d 51, 72 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

Viewing the evidence in the light most favorable to the verdict, there was ample evidence that appellant acted with deliberation. Barbara Roam wrote a note to appellant telling him that she was leav-

ing. There was evidence that she begged her prior boyfriend to take her back because she was afraid "something bad" was going to happen to her. There was evidence that the appellant had caused bruises on the victim. There was evidence that the fatal blow was the second, not the first, attempt to stab the victim. There was evidence from which the jury could infer that appellant planned to conceal the evidence and to cast suspicion upon Roam's former boyfriend. Most significantly, there was evidence that Barbara Roam lived for a period of fifteen minutes to four hours while she bled to death and was conscious for at least part of that time. Appellant could have sought assistance, but he did not. The inferences drawn from the circumstances are strengthened by appellant's failure to seek medical aid. *See State v. Barnes*, 740 S.W.2d 340, 344 (Mo. App.1987); *State v. Dickson*, 691 S.W.2d 334, 339 (Mo.App.1985); *State v. Hurt*, 668 S.W.2d 206, 216 (Mo.App.1984). There is sufficient evidence from which the jury could reasonably infer that appellant acted with premeditation and deliberation.

Appellant maintains that the trial court erred in denying his motions to suppress statements he made to the police because they were the result of coercion and custodial interrogation without the procedural safeguards required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also contends the court erred in not suppressing as fruit of the poisonous tree all subsequent statements and physical evidence discovered as a result of his confession.

■ "Once the admissibility of a statement or confession has been challenged, the burden of proving its voluntariness falls upon the state, which must show voluntariness by a preponderance of the evidence." *State v. Buckles*, 636 S.W.2d 914, 923 (Mo. banc 1982). "The test for 'voluntariness' is whether under the totality of the circumstances defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at

the time he confessed." *State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986). That there is evidence from which the trial court could have arrived at a contrary conclusion is immaterial. *Id.* at 915–16. When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether the court's decision is supported by substantial evidence, and deference is given to the trial court's superior opportunity to determine credibility of witnesses. *State v. Johns*, 679 S.W.2d 253, 261 (Mo. banc 1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

The record shows that late in the afternoon on March 23, 1987, Sgt. Speidel contacted the St. Charles County Sheriff's Department, who asked him to arrange an interview with appellant. After contacting appellant, Sgt. Speidel went to appellant's house. Appellant then followed Sgt. Speidel to the station. Sgt. Speidel and appellant arrived at approximately 8:30 p.m., and appellant waited in the watch commander's office until the St. Charles officers arrived between 10:30 and 11:30 p.m. Sheriff Eubinger and Sgt. Kaiser questioned appellant from 11:45 p.m. to 1:10 a.m. The officers asked appellant about his relationship with the victim, why he reported her missing, and where he thought she might be. During this time appellant seemed tired and emotional, and cried periodically. Finally, the officers asked appellant whether he was a Christian and whether he would tell the truth. Appellant then told the officers that he had "tried to take the knife away." At that time appellant became a suspect and was read his *Miranda* rights, which he waived. Questioning resumed. Appellant related his version of the events. He claimed he killed Roam in self-defense. Later appellant led the officers to the remaining body parts. Using this information, the officers obtained a warrant to search appellant's home and seized evidence found therein.

■ Appellant first contends that his confession was the result of coercion and was involuntary. The record, contrary to appellant's contention, reveals substantial evidence upon which the trial court

could have based its ruling and evidence sufficient to carry the state's burden of proof on the issue of voluntariness. First, the officers engaged in no coercive conduct. They made no promises or threats. Appellant was given drinks and opportunities to use the restroom and to take breaks. Although the room in which appellant was interviewed was small, there is no indication that appellant was psychologically or otherwise coerced as a result of being in close quarters. When appellant became upset, he was given time to calm himself. Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the due process clause of the fourteenth amendment. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). The predicate does not exist here. Secondly, appellant was advised of his *Miranda* rights and voluntarily waived those rights. Although not dispositive of the voluntariness issue, appellant's waiver is an important consideration. *Lytle*, 715 S.W.2d at 915. The record does not support appellant's contention that his confession was the result of coercion.

■■■■ Appellant also contends that the questioning prior to his confession was custodial interrogation and that his statements should be suppressed because he was not advised of his *Miranda* rights. Appellant's contention must fail. He voluntarily followed Sgt. Speidel to the station. At all times prior to his making the incriminating statement, appellant was free to depart. Even assuming appellant was a suspect in the minds of the officers, there is no custodial interrogation when a suspect is questioned when not under arrest or otherwise restrained of his liberty. *Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). Furthermore, in the absence of arrest or restraint of freedom of movement, questioning that takes place in a coercive environment does not require *Miranda* warnings. *Id.* at 495, 97 S.Ct. at 713. Finally, even after appellant confessed, he apparently assumed he was free to go; he asked to drive his own vehicle to the discovery site of the body parts so that he could later return

home in time to go to work. The trial court did not err in overruling the motions to suppress. Appellant's assertion that all subsequent statements and physical evidence should have been suppressed is likewise denied.

■■■■ Appellant claims the trial court erred in overruling his objection and request for a mistrial following a statement made during the state's penalty phase closing argument:

Mr. Applebaum: Dr. Case testified Barbara lived a minimum of fifteen minutes after the fatal wound, and that she was conscious. And that that could have been as much as four hours. The defendant was unable to refute that.

Appellant contends that this was an impermissible reference to his failure to testify.

Appellant's contention is mistaken. A prosecutor may not comment on a defendant's failure to testify, but a prosecutor may make reference to the defendant's failure to offer evidence. *State v. Sidebottom*, 753 S.W.2d 915, 920 (Mo. banc), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988). The prosecutor's statement here is a comment on appellant's failure to offer medical evidence to refute the state's expert testimony. There is no error.

Appellant claims the trial court erred in not instructing the jury about the meaning of "life without parole." The phrase "imprisonment for life by the Division of Corrections without eligibility for probation or parole" is contained in penalty phase Instructions 2B, 5B, 6B and 8B, following MAI–CR 3d 313.31, 313.42, 313.44 and 313.-48, respectively. After deliberating for approximately one hour during the penalty phase, the jurors sent this note to the judge:

Is there any legal situation under which a person can be released who has received life without parole; that is pardoned by the governor. Please distinguish between life in prison and natural life. Are these one in [sic] the same? What is the length of life, capital life.

The court's written response to the jury was, "You must be guided by the instructions that the court has given you."

■ Appellant's claim is without merit. When MAI notes on use do not provide for a definition, the court must not give one. *State v. Leisure*, 772 S.W.2d 674, 679 (Mo. App.1989) (citing MAI–CR 2d 33, Notes on Use), *cert. denied*, — U.S. —, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990); MAI–CR 3d 333.00, Notes on Use 1–2. A definition is not to be given "even if requested by counsel or the jury." MAI–CR 3d 333.00, Notes on Use 2F. None of the notes on use for the MAIs involved here provides for definitions of terms.

■ Failure to define words of common usage which would not confuse the jury does not constitute prejudice. *State v. Rodgers*, 641 S.W.2d 83, 85 (Mo. banc 1982). Had the instructions simply used the phrase "imprisonment for life," appellant's argument might have merit. Here, however, the phrase is modified by the words "without eligibility for probation or parole." The meaning of the words is clear.

This Court notes *State v. Henderson*, 109 N.M. 655, 789 P.2d 603 (1990), and *Bruce v. State*, 318 Md. 706, 569 A.2d 1254 (1990), cited by appellant, but does not find the cases persuasive.

Appellant contends his death sentence cannot stand because the one aggravating circumstance, submitted by Instruction 4B, was unconstitutionally vague. The instruction read:

> In determining the punishment to be assessed against the defendant for the murder of Barbara Ann Roam, you must first unanimously determine whether the following aggravating circumstance exists:
>
> Whether the murder of Barbara Ann Roam involved torture and or [sic] depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman.

The instruction tracks the language of MAI–CR 3d 313.40. The jury found as an aggravating circumstance beyond a reasonable doubt: "The murder of Barbara Ann Roam involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman." The jury did not find that the murder involved torture.

In *Walton v. Arizona*, — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the United States Supreme Court restates the analysis to be used in reviewing a state's application of a statutory aggravating circumstance. The federal court "must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer." *Id.* 110 S.Ct. at 3057. If so, the court must then "determine whether the state courts have further defined the vague terms and if they have done so, whether those definitions are constitutionally sufficient, *i.e.*, whether they provide *some* guidance to the sentencer." *Id.*

■ This Court first acknowledges that the language "depravity of mind ... outrageously or wantonly vile, horrible or inhuman," without further definition, is too vague to provide adequate guidance to a sentencer. *See Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Seeking to give substance to the terms, however, this Court has articulated a limiting construction of the aggravating circumstance at issue in this case. *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). The factors to be considered in determining whether depravity of mind exists include: mental state of defendant; infliction of physical or psychological torture upon the victim as when the victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse; and the nature of the crime. *Preston*, 673 S.W.2d at 11. The limiting construction employed by this Court requires that at least one of the *Preston* factors be present before this Court will find that the evidence supports a finding of depravity of mind. *Griffin*, 756 S.W.2d at 490.

The problem in this case rests upon the fact that the limiting definition was not given to the jury. In the absence of additional facts and circumstances revealed in the record in this case, vacation of the sentence might be required. *Walton*, however, indicates otherwise.

The Supreme Court of the United States stated in *Walton*:

Walton's final contention is that the especially heinous, cruel or depraved aggravating circumstance as interpreted by the Arizona courts fails to channel the sentencer's discretion as required by the Eighth and Fourteenth Amendments. Walton contends that the Arizona factor fails to pass constitutional muster for the same reasons this Court found Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance to be invalid in *Maynard v. Cartwright*, 486 U.S. 356 [108 S.Ct. 1853, 100 L.Ed.2d 372] (1988), and Georgia's "outrageously or wantonly vile, horrible or inhuman" circumstance to be invalid in *Godfrey v. Georgia*, 446 U.S. 420 [100 S.Ct. 1759, 64 L.Ed.2d 398] (1980).

*Maynard v. Cartwright* and *Godfrey v. Georgia*, however, are distinguishable in two constitutionally significant respects. First, in both *Maynard* and *Godfrey* the defendant was sentenced by a jury and the jury either was instructed only in the bare terms of the relevant statute or in terms nearly as vague. See 486 U.S., at 358–359, 363–364 [108 S.Ct. at 1856, 1859;] 446 U.S., at 426 [100 S.Ct. at 1763]. Neither jury was given a constitutional limiting definition of the challenged aggravating factor. Second, in neither case did the State appellate court, in reviewing the propriety of the death sentence, purport to affirm the death sentence by applying a limiting definition of the aggravating circumstance to the facts presented. 486 U.S., at 364 [108 S.Ct. at 1859;] 446 U.S., at 429 [100 S.Ct. at 1765.] These points were crucial to the conclusion we reached in *Maynard*. See 486 U.S., at 363–364 [108 S.Ct. at 1859.] They are equally crucial to our decision in this case.

When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in *Maynard* and *Godfrey*. But the logic of those cases has no place in the context of sentencing by a trial judge. Trial judges are presumed to know the law and to apply it in making their decisions. If the Arizona Supreme Court has narrowed the definition of the "especially heinous, cruel or depraved" aggravating circumstance, we presume that Arizona trial judges are applying the narrower definition. It is irrelevant that the statute itself may not narrow the construction of the factor.

110 S.Ct. at 3056–57.

In *Lewis v. Jeffers*, —— U.S. ——, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), the Supreme Court of the United States reiterates the holding of *Walton*:

Our decision in *Walton* thus makes clear that if a State has adopted a constitutionally narrow construction of a facially vague aggravating circumstance, and if the State has applied that construction to the facts of the particular case, then the "fundamental constitutional requirement" of "channeling and limiting ... the sentencer's discretion in imposing the death penalty," *Cartwright*, 486 U.S., at 362, 108 S.Ct. at 1858, has been satisfied.

The reasoning of *Walton* applies to the present case. Missouri law authorizes a sentencing procedure of a hybrid nature—a procedure presented by the facts and circumstances of this case. The jury announced a sentence, yet the trial judge acted, within the meaning of *Walton*, as the "final sentencer." *Rule 29.05*, vests in the trial court the "power to reduce the punishment within the statutory limits prescribed for the offense if it finds that the punishment is excessive." Appellant sought relief under *Rule 29.05*. He filed a motion for reduction of sentence in which he contended that the evidence failed to establish beyond a reasonable doubt that

any aggravating circumstance existed. He further claimed that both § 565.032.2(7) and Instruction 4B were unconstitutional. The judge conducted a hearing on the motion after which he stated on the record: "On the defense counsel's rather eloquent plea for reduction of sentence, the Court has listened attentively to that and has recalled the testimony and the evidence in this cause,[1] and the Court will overrule the Motion for Reduction of Sentence at this time."

■ Considering the procedure under which appellant was ultimately sentenced, this Court is not required to vacate the sentence solely on the basis that the jury announced the sentence. On the authority of *Walton*, this Court presumes that the trial judge knew and applied the relevant factors enunciated in *State v. Preston* when he evaluated and ruled on appellant's motion for reduction of sentence. Also on the authority of *Walton*, it is therefore irrelevant in this case that § 565.032.2(7) and Instruction 4B did not narrow the construction of the language in question. This Court concludes that § 565.032.2(7) and Instruction 4B, as construed by this Court and as presumed to have been applied by the trial court, furnished sufficient guidance to the final sentencer.

Appellant urges this Court to set aside his death sentence pursuant to the review mandated by § 565.035.3, RSMo 1986, which requires this Court independently to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

This Court has considered the record, including issues raised in this and four other points, and finds no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

■ The evidence in this case supports the finding that the murder of Barbara Ann Roam involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman. The victim bled to death over a period of fifteen minutes to four hours. As the trial judge concluded in his Report of the Trial Judge, "[t]he victim suffered a deep, heavy stab wound to the neck that resulted in paralysis and the severing of the vertebral artery resulting in her slowly bleeding to death while paralyzed but conscious." This tends to show that appellant had the "mental state" contemplated by the first *Preston* factor. In *Griffin*, this Court elaborated on this factor: "[t]he 'mental state of defendant' factor means that the defendant must have acted with callous disregard for the sanctity of life as, for instance, where the defendant plans a robbery with the intent to kill all witnesses ... or where the victim was killed while helplessly bound, after being otherwise incapacitated, or after complying with all of defendant's demands without resistance." *Griffin*, 756 S.W.2d at 490. In the present case the victim lay alive but helpless for an unknown period of time. Appellant could have obtained medical help for her, yet he chose not to do so. Akin to killing an incapacitated person, the behavior evidences a "callous disregard for the sanctity of life."

---

1. In his Report of this case, the trial judge found the sentence appropriate and described the offense for which the penalty was imposed:
   "Defendant was charged with first degree murder involving the death of Barbara Ann Roam by severing the cervical chord at C5 and severing the vertebral artery with a heavy knife struck with considerable force causing the then paralyzed victim to bleed to death slowly from fifteen minutes to four hours. After allowing the victim to bleed to death through the small vertebral artery, the victim's body was dismembered and her torso was found in a trunk in St. Charles County and her head, hands, feet, arms and legs were found in a stock watering pond in Jefferson County."

There was also evidence of appellant's lack of remorse. *See Preston*, 673 S.W.2d at 11. Appellant developed and carried out a plan to conceal his involvement in the crime. He carved the victim's body to conceal it and to render it difficult to identify. Appellant hid the body parts in separate locations. A section of blood stained carpet in appellant's bedroom had been removed and replaced. In an attempt to conceal his act, appellant enlisted the unknowing aid of the victim's family and friends. He authored a note, purportedly to the victim, after her death. He telephoned the victim's mother to report that her daughter was missing. He told other of Barbara Roam's relatives that she had gone somewhere. Appellant placed some of the body parts in a location that would cast suspicion on Roam's former boyfriend. Such detailed efforts to destroy incriminating evidence and to escape detection indicate lack of remorse. *State v. Rodden*, 728 S.W.2d 212, 222 (Mo. banc 1987); *State v. Lingar*, 726 S.W.2d 728, 741 (Mo. banc), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

There was testimony that appellant decapitated the body of Barbara Roam, severed her hands at the wrists, severed her legs at the knees, and severed one foot. Appellant inflicted additional wounds, evidencing other attempts to dismember the body. There was ample evidence to show the mutilation of the victim's body after death. *See Preston*, 673 S.W.2d at 11.

Section 565.035.3(3) requires this Court to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence and the defendant. For purposes of this section, the Court has examined those capital murder and first degree murder cases in which death and the alternative sentence of life imprisonment have been submitted to the jury and the sentence has been affirmed on appeal. This Court concludes that the penalty imposed in this case is not excessive or disproportionate to the penalties imposed in similar cases, considering the crime, the strength of the evidence

and the defendant. The cases most similar to this case are: *State v. Jones*, 705 S.W.2d 19 (Mo. banc), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986); *State v. Walls*, 744 S.W.2d 791 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983), *cert denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); and *State v. Boliek*, 706 S.W.2d 847 (Mo. banc), *cert. denied*, 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986). The evidence in this case shows that appellant stabbed his live-in girl friend in the neck with considerable force, allowed her to bleed to death, dismembered the body, and dumped the parts in two different locations as a part of a scheme to conceal his involvement in the murder. There is no doubt that appellant committed these acts. His contention that the evidence of deliberation is insufficient has been rejected. Appellant's punishment is not excessive or disproportionate.

### Plain Error

On appeal appellant raises twenty-one points and at least twenty-six subpoints, numerous of which contain allegations of error unsupported by objections at trial and/or not preserved in the motion for new trial. Review of these claims is limited to the standard of plain error. Plain error exists only when the court finds that a manifest injustice or a miscarriage of justice has occurred. *Rule 30.20; State v. McMillin*, 783 S.W.2d 82, 95 (Mo. banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990).

Appellant alleges the trial court committed plain error in not declaring, *sua sponte*, a mistrial following the state's guilt phase closing argument. He claims the following argument was an impermissible comment on his failure to testify:

And when you think about self-defense, let me tell you something. You remember this. Put yourself in our position just a second. How do you disprove self-defense? There was only two people there, and one of them is dead and can't talk for herself.

The prosecutor's argument was improper and under different circumstances might constitute reversible error. *See State v. Williams*, 673 S.W.2d 32, 35 (Mo. banc 1984). The trial court was prepared to sustain appellant's motion for a mistrial and so informed all counsel. Appellant nevertheless withdrew his motion. He took the stand and testified that he understood he was waiving any claim of error regarding this specific argument. He was questioned by his counsel and by the court at great length. It is apparent that appellant made an informed and deliberate choice to, as it were, gamble on the verdict. He unequivocally waived his objection to the prosecutor's comment and may not now claim error. *See State v. Mallett*, 732 S.W.2d 527, 538 (Mo. banc), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). Appellant's additional contention that this comment was a deliberate attempt to poison the jury or provoke a mistrial is not supported by the record.

■ Appellant claims that a question during the cross-examination of a penalty phase witness impermissibly converted a mitigating circumstance submitted to the jury into an aggravating factor. One of appellant's high school teachers testified on direct examination that when appellant was a student "most students picked on him and teased him," that in response "he took it, sort of cried," that he "didn't want to go to the restroom when other boys were in there," and that "he was basically a loner." The prosecutor pursued this on cross-examination:

Q: Did you find his behavior that he wouldn't go into the restroom when other boys were in there as different or strange as it related to other—?

A: To some degree, yes.

Q: Were there other behaviors of Mr. Feltrop that you noticed or that you can speak of as being rather strange ...

A: Just that kids picked on him and teased him. He might have created some of his own problems. But, some kids are that way, though, just a growing up process.

. . . . .

Q: Did you ever have a conversation with Ralph Feltrop about these strange behavior patterns?

A: Not that I recall, no.

One of the mitigating circumstances the jury was instructed to consider was "[t]he personal background and history of the defendant." Appellant claims that the state's final question was an effort to denigrate and recharacterize appellant's "dysfunction" as an aggravating rather than mitigating factor. Appellant relies on a line of cases holding that in capital cases the sentencer must not be precluded from considering, *as a mitigating factor*, any aspect of defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Appellant's reliance is misplaced. Appellant does not claim he was precluded from presenting any mitigating evidence. He does claim that what was offered as mitigating evidence was argued by the prosecutor as aggravating evidence contrary to *Zant v. Stephens*, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983). The record does not support appellant's contention that the state argued that appellant's personal background and history constituted an aggravating factor. The state's questions were designed to demonstrate that appellant's behavior as a student was not unusual enough for a teacher to have felt compelled to discuss the behavior with appellant. The state's argument went to the fact that appellant's behavior was simply insufficient to be considered as a mitigating circumstance. The trial court did not plainly err in failing to declare a mistrial.

■ Appellant claims that the prosecutor's statement that this was the "proper case" for the death penalty should have led to a mistrial. The prosecutor used the phrase several times:

Back in jury selection, a week ago, each of you said that in the proper case you could vote to impose the death penalty. And this is that case. Can you conceive of a more appropriate case? The Defendant knowingly killed Barbara Roam and then went one step further and mutilated her. . . .

He had a choice not to carry her into the bathroom and allow her to bleed to death and allow her to die. He has made his choice. And now there is no other choice. This is the proper case. Can you conceive of a more appropriate case? ... Now, in the proper case each and every one of you gave me your word, and you said in the proper case you could vote death. I believed you then and I believe you now. Can you conceive of a more proper case, where a guy murdered someone and let them bleed for at least fifteen minutes? We know she was paralyzed. . . .

And he made a choice, a choice to kill, a choice to let her bleed to death and a choice to dismember her. This man deserves the death penalty. Basically, ladies and gentlemen, can you conceive of a more proper case?

Appellant argues that the repeated reference to the "proper case" was improper because it indicated to the jury that the sentencing decision had already been made, perhaps by the legislature, or that the prosecutor had compared this case to all other first degree murder cases and had determined it to be a proper case for the death penalty. Appellant claims that this violates the rule in *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), which prohibits "rest[ing] a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Appellant also submits that the prosecutor injected his personal opinions and viewpoints into the process and implied that he possessed additional personal knowledge of the case, contrary to *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986), and

*Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986).

There is no violation of *Caldwell*. The prosecutor told the jury plainly, "It is now your duty to determine what punishment the Defendant is to receive." Nothing in the prosecutor's statements undermines the jury's understanding of its responsibility to act as sentencer. Appellant's argument that the prosecutor injected his own opinions or implied additional knowledge is also not supported by the record. The prosecutor supported his statements that this was a "proper case" by noting details of the crime. He did not rely on personal opinion or imply that he had additional information. In the penalty phase of a capital murder case both parties should be given wide latitude in arguing the matter of punishment. *State v. McDonald*, 661 S.W.2d 497, 506 (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985), citing *Gregg v. Georgia*, 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976). There is no plain error.

The Court has exhaustively examined each and every other point and subpoint of plain error asserted by appellant and finds no plain error and concludes appellant received a fair trial.

## RULE 29.15

Appellant makes numerous claims of ineffective assistance of counsel. A substantial number of claims were not raised in the motion court, thus are not proper subjects for review. This Court notes, however, that substantially all of the issues raised on appeal but not presented below have been considered in the direct appeal. In certain other claims appellant complains of the effectiveness of his motion counsel. A postconviction proceeding is not to be used to challenge the effectiveness of counsel in the postconviction proceeding. *Lingar v. State*, 766 S.W.2d 640, 641 (Mo. banc), *cert. denied*, —— U.S. ——, 110 S.Ct. 258, 107 L.Ed.2d 207 (1989). This Court addresses the three claims of ineffective

assistance of counsel raised in the motion court.

The movant has the burden of proving his grounds for relief by a preponderance of the evidence. *Rule 29.15(h)*. This Court's review of a denial of postconviction relief is limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous. *Rule 29.-15(j)*. The findings and conclusions are deemed clearly erroneous only if a full review of the record leaves the appellate court with the definite and firm impression that a mistake has been made. *Sidebottom v. State*, 781 S.W.2d 791, 795 (Mo. banc 1989), *cert. denied*, — U.S. —, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990).

■■■■ To show that counsel's assistance was so defective as to require reversal of a conviction or death sentence, the movant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S.Ct. at 2066. The movant must also overcome the presumption that the challenged action was sound trial strategy. *Id.* at 689, 104 S.Ct. at 2065. To show prejudice, the movant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068.

■■■■ Appellant claims counsel was ineffective because he waived a mistrial. The following exchange occurred during the guilt phase closing argument:

> Mr. Finnical: ... Put yourself in our position just a second. How do you disprove self-defense? There was only two people there, and one of them is dead and can't talk for herself. The Judge has read to you the instruction—
> Mr. Schmidt: Judge, I object. May we approach the bench?

Out of the hearing of the jury, counsel moved for a mistrial on the ground that the state commented on appellant's failure to testify. The trial court overruled the motion. Following closing arguments, the jury began deliberations. After a weekend adjournment, the state indicated that it was prepared to consent to appellant's motion for mistrial. Counsel then attempted to withdraw the motion. The trial judge stated that he had prepared an order sustaining the motion. After discussion, counsel withdrew both his objection and the motion for mistrial. The trial court and both counsel then examined appellant, who specifically waived the objection and the motion.

The motion court found counsel's decision, "viewed from that point in history, was reasonable." At the hearing, counsel testified that he felt that the state had committed errors which would not be repeated on retrial. He felt that Dr. Case, the state's expert forensic witness, had given inconsistent testimony on a fairly substantial point and that the state had made a mistake in calling Bill Mangrum, the victim's former boy friend. He also thought the jury selection process had gone well for appellant. Counsel stated that he did not want a mistrial because there would certainly be a retrial since the state would not dismiss the charges and appellant would not plead guilty to reduced charges. The motion court's conclusion that counsel's judgment was reasonable is not clearly erroneous.

■■■■ Appellant next claims counsel was ineffective because he did not allow appellant to testify in either the guilt or penalty phase. The motion court found that appellant did not request to testify. Specifically, the motion court found that "Feltrop's testimony that he requested to testify is not believable."

Appellant testified in the motion hearing that he told his attorney several times before trial and during the guilt phase that he wanted to testify and that he did not like the defense of self-defense. Counsel, on the other hand, testified that during the pretrial period appellant changed his mind several times about the defense he wanted to present. Counsel investigated several theories, finally deciding to present a de-

fense of self-defense. Appellant also continually changed his "story" throughout the trial. Counsel testified that he and appellant "had quite a few conversations on his right and ability to testify" and that appellant understood that right. Counsel believed that if appellant testified, he would deny having committed the crime, and this would likely diminish his credibility. Counsel advised appellant not to testify in the penalty phase. Counsel testified that the only time appellant mentioned an intent to testify was after the close of evidence in the penalty phase. Counsel testified that he thought appellant was "playing games with me at that point." Appellant's testimony would have been contrary to the theory advanced by counsel, and counsel was not ineffective for not calling appellant to testify. After reviewing the record, this Court is not left with the definite and firm impression that a mistake has been made. *See Sidebottom,* 781 S.W.2d at 795.

In his motion, appellant asserts that counsel was ineffective because he failed to present expert testimony from a psychiatrist or psychologist regarding appellant's mental condition, which could have been presented as a mitigating circumstance. In his brief, however, appellant claims ineffective assistance in counsel's failure to present psychiatric testimony in support of a defense based on the battered spouse syndrome. The motion court found counsel's tactical decision not to call a mental health professional appropriate.

The record supports the motion court's finding. Appellant's original plea was not guilty by reason of mental disease. Max Givon, a forensic psychologist, conducted a pretrial examination of appellant on June 22, 1987, pursuant to Chapter 552, RSMo. Dr. Givon concluded that appellant had no mental disorder and did not suffer from a mental disease or defect that would excuse him from criminal responsibility for his actions.

Appellant filed a motion for a second examination. A.E. Daniel, M.D., examined appellant on October 3, 1987. Dr. Daniel also found that appellant did not suffer from a mental disease or defect, but recommended that his "state of mind, particularly as it relates to constant battering by the victim should be given some consideration as a mitigating factor when the degree of the offense is considered and later at the penalty stage." Appellant then filed notice of intention to offer evidence of battered spouse syndrome.

The state then sought an examination. Joseph Shuman, M.D., examined appellant on February 9, 1988. Dr. Shuman had opportunity to review the two previous reports before making his examination. He agreed that there was no evidence to show that at the time of the alleged offense appellant did not know or could not appreciate the nature, quality and wrongfulness of his conduct nor that he was incapable of conforming his conduct to the requirements of the law. In discussion of the battered spouse syndrome, Dr. Shuman found that "[i]f descriptions are accurate, as given by Mr. Feltrop, then by definition he would be considered to be a victim of abuse."

Daniel Cuneo, a licensed clinical psychologist, testified at the motion hearing. He had reviewed the three reports and administered a personality inventory to appellant prior to the motion hearing. He testified that appellant suffers from a mental disorder and had probably suffered from the disorder since early in high school. The disorder did not qualify as a mental disease or defect under Chapter 552. In Dr. Cuneo's opinion, a fight with the victim may have triggered a "rage reaction" in appellant, consistent with his mental disorder. Dr. Cuneo also opined that all of the reports were consistent with each other and could have been presented during the penalty phase.

Counsel testified at the motion hearing that he had originally anticipated calling Dr. Daniel during both the guilt and penalty phases, but decided not to call him because cross-examination would elicit statements made by appellant to Dr. Daniel inconsistent with the defense of self-defense. Counsel also determined that he could call lay witnesses to emphasize traits

of appellant that could be considered in mitigation and thereby avoid adverse testimony from the experts.

The record reflects that counsel investigated psychiatric evidence to support a defense premised on battered spouse syndrome and to demonstrate mitigating circumstances. His choice not to present expert testimony was based on reasonable trial strategy. The motion court's finding was not clearly erroneous.

The conviction, sentence, and judgment of the postconviction hearing court are affirmed.

ROBERTSON, RENDLEN, HIGGINS and BILLINGS, JJ., concur.

BLACKMAR, C.J., concurs in part and dissents in part in separate opinion filed.

HOLSTEIN, J., concurs in part and dissents in part in concurring in part and dissenting in part opinion of BLACKMAR, C.J.

BLACKMAR, Chief Justice, concurring in part and dissenting in part.

I concur in the affirmance of the conviction and the order denying 29.15 relief.

I cannot, however, accept the startling proposition that error in the instruction submitting the single statutory aggravating circumstance may be corrected by the action of the trial court in ruling the application for reduction in sentence, under the authority of Rule 29.05. The simple reason is that there is no assurance that the jury would have authorized a death sentence if it had been properly instructed in accordance with *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and the limiting construction announced in *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc 1984).

The instruction, as given, submitted the single aggravating circumstance that "the murder ... involved torture and/or [sic] depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman." Section 565.-032.2(7), RSMo 1986. The principal opinion properly found that this submission conflicts with *Godfrey*. The instruction also runs afoul of *Maynard v. Cartwright*. *See also, Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir.1989) *cert. denied, Delo v. Newlon*, —— U.S. ——, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). The fault in the instruction is that it fails to instruct the jury with sufficient precision as to the findings which must be made to lay the foundation for a death sentence. In our idiom, the instruction gives the jury a roving commission.

In *Preston* we sought to flesh out the essential requirements of the "depraved mind" submission, in order to channel the jury's inquiries along lines sufficiently definite to stand constitutional scrutiny. The present jury, however, was not instructed in accordance with the *Preston* guidelines. As the Supreme Court of the United States makes clear, the direction to the jury is not adequate unless the narrowing construction is given to the jury in the form of instruction. In *Walton v. Arizona*, —— U.S. ——, 110 S.Ct. 3047, 3056-7, 111 L.Ed.2d 511 (1990), the court says:

> When the jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury on the bare terms of an aggravating circumstance. That is unconstitutionally vague on its face. ...

It is significant that this jury specifically excluded "torture" in its reported finding. It must be assumed, therefore, that it was unwilling to make the explicit finding of torture which might possibly sustain its death verdict. *See Mercer v. Armontrout*, 844 F.2d 582 (8th Cir.1988), *cert. denied*, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988).

The principal opinion now tries to save the verdict, relying on *Walton*, by holding that the trial judge is the "final sentencer."[1] *Walton*, by its express statement is limited to cases of judge sentencing rather

---

[1] It would be equally logical to argue that the governor acts as "final sentencer" according to § 565.020.2, RSMo, which grants the governor power to "release" the defendant.

than jury sentencing, in accordance with Arizona practice. *Id.* 110 S.Ct. at 3051. The principal opinion would extend *Walton* so as to save the death sentence in this case. I believe that this attempt runs counter to basic principles of Missouri law, which commits the assessment of the death sentence, if appropriate aggravating circumstances are found, to the complete discretion of the jury. § 565.030.4, RSMo 1986.

It is inaccurate to say that the judge is the final sentencer, because the judge may pronounce a death sentence only if the sentence is authorized by a jury, or if the jury has found aggravating circumstances and has explicitly reported its failure to agree on the sentence. § 565.032, RSMo 1986. Unless the jury is properly instructed, its verdict cannot support a sentence of death. It simply cannot be assumed that a properly instructed jury would have returned a death sentence. I am quite prepared to agree that the trial court, in ruling the 29.05 motion for reduction of sentence, gave attention to the *Preston* formulation. But the jury did not have the benefit of this formulation. I am aware of no other situation in which Missouri law authorizes the trial court to correct a verdict which is based on an erroneous instruction.

*Walton* is not sufficient authority because it involves judge sentencing rather than jury sentencing. Perhaps the Supreme Court of the United States will not disturb this Court's radical alteration of the requirements of Missouri law, concluding that we have the authority to allocate the sentencing function between judge and jury as we see fit. The legislature has already allocated these functions.

But we should be true to our own law and traditions. Up to now the right of trial by jury has been considered to be a right of trial by a properly instructed jury. The principal opinion is judicial legislation substantially altering the right of trial by jury in death cases. I cannot join it. We should not strain to affirm death sentences. We should, if anything, insist on stricter adherence to procedural requirements when the ultimate penalty is at stake.

I would vacate the death sentence and remand the case for further proceedings consistent with the views here expressed.